No. 23-1068

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTS CIRCUIT

---

Samantha Howard,
*Plaintiff-Appellee,*

V.

City of Sedalia, Missouri d/b/a Bothwell Regional Health Center,
*Defendant-Appellant.*

---

Appeal from the United States District Court
For the Western District of Missouri, No. 2:21-cv-04034-MDH
The Honorable M. Douglas Harpool

---

**BRIEF OF APPELLEE SAMANTHA HOWARD**

---

**Fagan & Emert, LLC**

/s/Jennifer R. Johnson
Jennifer R. Johnson          #59197
800 New Hampshire St., Ste. 110
Lawrence, KS 66044
(785) 331-0300 – Telephone
(785) 331-0303 – Facsimile
jjohnson@faganemert.com
Attorney for Appellee

# SUMMARY OF THE CASE

Samantha Howard ("Howard") is a Type 1 diabetic, diagnosed when she was a toddler. She is required to actively manage this disease to avoid substantial long-term complications, as well as acute threats that accompany the use of insulin. With the support of her physician, she applied for and, after a two-year wait, was provided with a diabetic service animal through an accredited organization that trains and places service animals. She asked her employer, the City of Sedalia d/b/a Bothwell Regional Hospital ("Bothwell") to allow her service animal to accompany her to work in its hospital pharmacy. Bothwell refused.

The Americans with Disabilities Act of 1990 (the "ADA") requires an employer to act in good faith with respect to the interactive process. The evidence at trial was more than sufficient to support the jury's finding that Bothwell did not act in good faith. Instead, it engaged in a search for authority to support its denial of her request and ignored any authority to the contrary.

The jury heard evidence from and arguments by Bothwell that accused Howard of acting in bad faith, and asserted Howard was responsible for the breakdown of the interactive process. The Jury disagreed and found that Bothwell denied Howard an accommodation that would permit her to enjoy equal benefits and privileges of her employment and awarded her damages for lost wages and emotional distress.

Appellee requests 15 minutes for oral argument per side.

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................iv

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF THE CASE............................................................... 2

SUMMARY OF ARGUMENT ............................................................... 8

ARGUMENT ..................................................................................... 11

    I.  THE COURT LACKS JURISDICTION TO REVIEW THE TRIAL COURT'S DENIAL OF SUMMARY JUDGMENT; BUT IF THERE IS JURISDICTION, THERE WAS SUFFICIENT EVIDENCE TO SUPPORT THE JURY'S VERDICT THAT BOTHWELL WAS RESPONSIBLE FOR THE BREAKDOWN OF THE INTERACTIVE PROCESS AND DID NOT ACT IN GOOD FAITH ...........................11

        A.  This Court lacks jurisdiction to review the Trial Court's denial of summary judgment. ...............................................11

        B.  To the extent the Court considers the issue preserved and properly appealed, the Trial Court did not abuse its discretion when it denied Bothwell's Motion for New Trial based on the sufficiency of the evidence............................................14

    II.  HOWARD PRESENTED EVIDENCE THAT DEMONSTRATED HER SERVICE ANIMAL WAS EFFECTIVE IN ALERTING HER TO HIGH AND LOW BLOOD SUGARS. ............................................22

    III.  HOWARD ESTABLISHED THAT SHE REQUIRED ACCOMMODATION TO ENJOY EQUAL BENEFITS AND PRIVILEGE OF EMPLOYMENT. .......................................27

    IV.  THE TRIAL COURT'S DECISION NOT TO INSTRUCT THE JURY THAT GOOD FAITH IS AN ELEMENT OF HOWARD'S CLAIM WAS NOT AN ABUSE OF DISCRETION. ..........................38

        A.  The jury was instructed on both parties' duty to act in good faith and found Bothwell did not act in good faith; therefore, any instructional error was not an abuse of discretion because it was not prejudicial and would not have affected the verdict........38

Appellate Case: 23-1068    Page: 3    Date Filed: 06/29/2023 Entry ID: 5291076

B.  There was no instructional error.........................................................41

V.  THE TRIAL COURT'S DECISION NOT TO SUBMIT A JURY
    INSTRUCTION ON CONSTRUCTIVE DISCHARGE WAS NOT
    AN ABUSE OF DISCRETION. ............................................................41

    A. The Trial Court did not abuse its discretion in refusing to submit
       Bothwell's instruction on constructive discharge. ............................42

    B. Bothwell does not argue that an adverse employment action is an
       element of Howard's claim and, as such, that issue is not
       presently before the Court. ................................................................43

    C. An adverse employment action is not an element of
       Howard's claim ..................................................................................44

CONCLUSION...................................................................................................46

CERTIFICATE OF COMPLIANCE.....................................................................47

CERTIFICATE OF SERVICE ..............................................................................47

Appellate Case: 23-1068    Page: 4    Date Filed: 06/29/2023 Entry ID: 5291076

# TABLE OF AUTHORITIES

## Cases

*Am. Family Mut. Ins. Co. v. Graham*,
792 F.3d 951 (8th Cir. 2015) ........................................................ 38, 41

*Buckingham v. United States*,
998 F.2d 735 (9th Cir. 1993) ............................................................... 35

*Burry v. Eustis Plumbing & Heating, Inc.*,
243 F.3d 432 (8th Cir. 2001) ........................................................ 39, 41

*Children's Broad. Corp. v. Walt Disney Co.*,
357 F.3d 860 (8th Cir. 2004) .................................................... 38, 39, 41

*Cloe v. City of Indianapolis*,
712 F.3d 1171 (7th Cir. 2013) ............................................................. 33

*Coleman v. Burlington N., Inc.*,
681 F.2d 542 (8th Cir. 1982) ............................................................... 22

*Computrol, Inc. v. Newtrend, L.P.*,
203 F.3d 1064 (8th Cir. 2000) ............................................................. 15

*Dupree v. Younger*,
598 U.S. ___, 143 S. Ct. 1382 (2023) ......................................... 11, 12, 13

*Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*,
831 F.3d 815 (7th Cir. 2016) ............................................................... 13

*Exby-Stolley v. Board of County Commissioners*,
979 F.3d 784 (10th Cir. 2020) ...................................................... 33, 45

*Faidley v. United Parcel Service, Inc.*,
889 F.3d 933 (8th Cir. en banc 2018) .................................................. 44

*Gleed v. AT&T Mobility Services*,
613 Fed. Appx. 535 (6th Cir. 2015) ................................................ 34, 35

iv

Appellate Case: 23-1068     Page: 5     Date Filed: 06/29/2023 Entry ID: 5291076

*Hill v. Associates for Renewal in Education, Inc.,*
897 F.3d 232 (D.C. Cir. 2018) ............................................................... 34

*Hopman v. Union Pacific Railroad*,
2022 WL 963662 (E.D. Ark. March 30, 2022) .................................... 27

*Hopman v. Union Pacific Railroad*,
68 F.4th 394 (8th Cir. 2023) ................................... 8, 27, 28, 29, 33, 35, 38, 43, 44

*Hustvet v. Allina Health Systems,*
910 F.3d 399 (8th Cir. 2018) ............................................................... 23

*Jaques v. Clean-Up Group, Inc.,*
96 F.3d 506 (1st Cir. 1996) ................................................................. 35

*Johnson Int'l Co. v. Jackson Nat'l Life Ins. Co.,*
19 f.3d 431 (8th Cir. 1994) ................................................................. 12

*Jones v. Swanson,*
341 F.3d 723 (8th Cir. 2003) ......................................................... 39, 41

*Keeper v. King*,
130 F.3d 1309 (8th Cir. 1997) ............................................................. 14

*McKay v. WilTel Commc'n Sys., Inc.,*
87 F.3d 970 (8th Cir. 1996) ........................................................... 39, 41

*Metropolitan Life Ins. Co. v. Golden Triangle,*
121 F.3d 351 (8th Cir. 1997) ........................................................ 11, 12

*Nawrot v. CPC Int'l,*
259 F.Supp.2d .......................................................................... 30, 31, 37

*New York Marine and General Ins. Co. v. Continental Cement Co., LLC,*
761 F.3d 830 (8th Cir. 2014) ............................................................... 12

*Ortiz v. Jordan*,
562 U.S. 180, 131 S. Ct. 884, 178 L.Ed.2d 703 (2011) ...................... 13

v

*Ortiz v. Werner Enterprises, Inc.,*
834 F.3d 760 (7th Cir. 2016) ................................................................. 33

*Parkhill v. Minn. Mut. Life Ins. Co.,*
286 F.3d 1051 (8th Cir. 2002) ......................................................... 43, 44

*Peebles v. Potter,*
354 F.3d 761 (8th Cir. 2004) ..................................................... 33, 45, 46

*PFS Distribution Co. v. Raduelchel,*
574 F.3d 580 (8th Cir. 2009) ................................................................. 14

*Schallehn v. Cent. Tr. & Sav. Bank,*
877 F.Supp. 1315 (N.D. Iowa 1995) ...................................................... 28

*Slidell, Inc. v. Millennium Inorganic Chems., Inc.,*
460 F.3d 1047 (8th Cir. 2006) ............................................................... 15

*US Airwais, Inc. v. Barnett,*
535 U.S. 391, 122 S. Ct. 1516, 152 L.Ed. 589 (2002) .......................... 32

*Wilson v. City of Hazelwood, Mo.,*
628 F.Supp.2d 1063 (E.D. Mo. 2008) ................................................... 22

## Statutes

42 U.S.C. § 1981a(a)(3) ........................................................................ 41
42 U.S.C.A. § 12112 (West) ............................................................ 45, 46
Americans with Disabilities Act..i, 17, 27, 28 30, 31, 32, 33, 34, 35, 37, 44, 45, 46

## Other Authorities

2008 Senate Statement of Managers ..................................................... 46
29 C.F.R. § 1630.9 ................................................................................ 46
29 C.F.R. § Pt. 1630 App. .......................................................... 29, 30, 46

vi

# JURISDICTION

As to Appellant's first issue on appeal, this Court does not have jurisdiction as to the Trial Court's order denying summary judgment. *Dupree v. Younger*, 598 U.S. ___, 143 S. Ct. 1382 (2023); *New York Marine and General Ins. Co. v. Continental Cement Co., LLC*, 761 F.3d 830, 838 (8th Cir. 2014) (quoting *Johnson Int'l*, *Johnson Int'l Co. v. Jackson Nat'l Life Ins. Co.*, 19 F.3d 431, 434 (8th Cir. 1994). See argument, Section I.A., *infra*. Appellee does not otherwise dispute this Court's jurisdiction over the remainder of issues.

1

## STATEMENT OF THE CASE

Samantha Howard ("Howard") is a Type 1 diabetic, diagnosed as a toddler. (Trial Tr. Vol. III, pp. 329:21-330:3). As with most type 1 diabetics, she has a history of hypoglycemic (low blood sugar) and hyperglycemic (high blood sugar) episodes. (*Id*. at pp. 329:4-332:14, 333:17-335:13). She also experiences episodes of hypoglycemic unawareness, which occur when her blood sugar drops dangerously low without symptoms. *Id*. When she experiences those episodes, she is at significant risk for severe medical complications, up to and including death. (App. 1776 at 15:7-16:20).

As a young adult, Howard moved to Kansas City, Missouri, to attend pharmacy school. (Trial Tr. Vol. III, pp. 332:24-333:9). This was the first time she lived alone. *Id*. Given the risk of hypoglycemic episodes, including the risk that Howard could become debilitated and unable to treat herself, Howard started investigating the use of a diabetic service dog. (Trial Tr. Vol. III 333:10-334:1, 340:16-342:16). Diabetic service dogs are trained to detect high and low blood sugars and are also able to assist by providing support in the event of a hypoglycemic occurrence. (App. 1783, at 41:19-44:1).

Howard applied for the diabetic service dog with an accredited training organization while in pharmacy school, but the wait to obtain one was long. (Trial Tr. Vol. III, p. 342:11-16). In the interim, she accepted her first position as a

pharmacist with Bothwell and started working in the hospital pharmacy in the Spring of 2019. (*Id.* at pp. 342:24-344:6). In May of 2020, Howard received notice from the organization where she applied to obtain a diabetic service dog that a dog had been trained and was ready for her. (*Id.* at 359:15-360:6; Trial Ex. J-34, App. 1524-25). She needed to come to a training session with the dog, and then would be allowed to take it home. *Id.*

Thereafter, she requested accommodation from Bothwell to allow her to bring her service animal to work in the hospital pharmacy, excluding the sterile compounding suite (inclusive of the ante room and sterile room) from the request. (Trial Exs. J-6, J-7, J-8, J-9, J-10, J-11, App. 1432-1445). She provided a letter from one of her treating physicians to support the request, which informed Bothwell that Howard suffers from Type 1 diabetes, is insulin dependent, and suffers from episodes of hypoglycemic unawareness. *Id.* The letter stated that the diabetic service dog was a medical necessity and would need to be accommodated in the workplace. *Id.*

In response, Bothwell placed Howard on a paid leave of absence, and proceeded – purportedly – to investigate the accommodation request. Bothwell requested additional documentation from the physician, which Howard provided. *Id.* It further requested authorization to talk to the physician, which Howard provided, but Bothwell never utilized the authorization to speak with Howard's medical team.

3

(*Id*; Trial Tr. Vol. I, pp. 38:6-39:23). Howard also provided information to allow Bothwell to contact the accredited organization from which she obtained the animal. (Trial Ex. J-10, App. 1441). Bothwell never contacted that organization, nor did it inquire with respect to any specifics related to the animal. (Trial Tr. Vol. I, pp. 47:4-48:4).

Instead, the HR director recruited a "team" of employees and asked them to provide reports that "supported the denial" of the request. (Trial Ex. J-12, App. 1446-48; Trial Tr. Vol. I, pp. 37:6-38:5; Trial Tr. Vol. II, pp. 246:22-248:10). In response, the team provided reports that cited various reasons the dog could not be permitted in the pharmacy, relying in large part on the fact that the pharmacy included a sterile compounding suite, the sterility of which would be compromised by the dog. (Trial Exs. J-12, J-14, App. 1446-50, 1456-57; Trial Ex. J-50, J-59, App. 1677-78, 1750; Trial Tr. Vol. II, pp. 265:8-267:5).  Notably, Kathy Trogden, certified in infection prevention and control, testified that no one advised her that the request did not include a request to bring the service animal into the sterile compounding suite. To evaluate that issue she would have to complete a   full risk assessment, which Bothwell declined. (Trial Tr. Vol. II, pp. 250:1-16, 251:25-252:4; 258:5-259:10; 265:8-267:24).

When produced, the team's reports relied on various regulations and guidance that did not apply to the situation to support a recommendation to deny the request.

4

(Trial Tr. Vol. II, pp. 269:2-275:8; Trial Ex. J-50, App. 1677-78). For example, they relied on reports from the CDC related to risk of animals in pharmacy but ignored sections of those very same reports that were specific to service animals and supported the propriety of Howard's requested accommodation. (Trial Ex. J-38, App. 1529-31; Tr. Ex. J-40, D-38, App. 1533-1638, 1898-1901). It relied on FDA guidance that did not apply to the area of the pharmacy where Howard proposed her service animal be allowed, i.e, outside of the sterile compounding suite. (Trial Ex. J-40, App. 1533-1638; Trial Tr. Vol. II, p. 125:10-126:17, 138:18-139:14). It cited Missouri pharmacy regulations but ignored the regulation that specifically excluded service animals from the general rule that animals should not be permitted in pharmacies. (Trial Tr. Vol II, pp. 301:13-302:17; Trial Ex. J-56, App. 1699-1749). Additionally, the pharmacy director, Dr. Brad Nicholson, obtained feedback from two regulatory agencies, and subsequently mischaracterized their position in reports back to the team. Nicholson asserted the agencies would not allow a service animal in the pharmacy, outside the sterile compounding suite, when, in fact, those contacts informed the pharmacy director that each case would be evaluated on a case-by-case basis. (Trial Ex. J-20, J-21, App. 1460-65).

Howard provided ideas to mitigate any risk associated with allowing the service animal in the pharmacy. (Trial Ex. J-43, App. 1639-43). While Bothwell represented that the team considered these proposals, testimony later confirmed that

5

was not true. (*Id.*; Trial Tr. Vol. II, pp. 210:10-22, 261:9-12). Howard also proposed transfer to an adjacent but separate employee pharmacy, further removed from the sterile compounding suite. (Trial Ex. J-24, App. 1472-76; Trial Ex. P-35, App. 2651-55). Bothwell told Howard it had already hired someone for the position. It had not. (Trial Tr. Vol. I, pp. 62:6-64:9; Trial Tr. Vol. II, pp. 285:16-286:10; Trial Ex. J-13, App. 1451-55). Bothwell also told Howard that she was not qualified for the position based on a job description they created simultaneously with her request, but then never adopted. *Id.*

Then, Howard discovered that Bothwell had posted her job online. (Ex. J-16, App. 1458-59; Trial Ex. P-52, P-53, P-55, App. 2662-2690). While Bothwell represented that it was not recruiting to fill her position, documents produced in discovery confirmed Nicholson had submitted a requisition form to replace Howard two weeks after Bothwell initially denied Howard's request for accommodation. *Id.* Bothwell lied when it represented it was not recruiting to fill Howard's position, as established by the job requisition form Nicholson completed specifically stating that he was recruiting for Howard's replacement. *Id.* At that point, it was clear that Bothwell was not engaged in the interactive process in good faith but was, instead, stonewalling her request in an effort to force her to resign. (Trial Tr. Vol. III, pp. 395:18-397:7). She moved back to Kansas City and attempted to locate a position.

6

It took some time, but she did ultimately found a position working in Missouri hospital pharmacies with her service animal by her side. (*Id*. at pp. 404:22-405:25).

Howard brought this action for Bothwell's failure to accommodate her disability. A jury heard Bothwell's "version" of the story and did not believe it. They found in her favor, determined Bothwell had failed to accommodate her, and that Bothwell did not act in good faith during the interactive process. (App. 1012, R. Doc. 134). It awarded her damages for lost wages and emotional distress.

## SUMMARY OF ARGUMENT

With respect to the first issue on appeal, this court does not have jurisdiction to review the Trial Cort's decision denying Bothwell summary judgment. To the extent this Court reaches the merits of the issue, there was ample evidence from which the jury could conclude that Bothwell acted in bad faith and was the party responsible for the breakdown of the interactive process.

Bothwell also argues that there was no evidence as to the efficacy of Howard's service dog. First, this court requires relatedness, not proof, of efficacy. Further, Howard introduced sufficient evidence of efficacy to support the jury's verdict. This included evidence offered by Howard related to her service dog's effectiveness, her treating physician who believed diabetic service dogs can assist a diabetic in managing the disease, as well as Bothwell's own diabetes expert who relied on a study that proved service animals can detect high and low blood sugars. He admitted this in cross examination.

With respect to Bothwell's third argument on appeal, this Court should limit its recent holding in *Hopman v. Union Pacific Railroad*, 68 F.4th 394 (8th Cir. 2023), to the facts of that case related to a service dog that provides solely mental and psychological support. At minimum, this Court should find that accommodations which permit an employee to manage their health, where failure to do so may lead to serious complications, including death, satisfies the "equal benefits and privileges

8

of employment" prong of her failure to accommodate claim. Here, Howard presented evidence that she uses her service animal to constantly monitor her blood sugar, detect dangerous lows, maintain her health, and avoid serious, long-term complications of her chronic disease. Science, and Bothwell's expert, agree that service dogs are able to detect high and low blood sugars. For this reason, Howard established that she requires the service animal to enjoy equal benefits and privileges of employment.

Finally, the Trial Court did not err when instructing the jury. The jury was specifically instructed related to the requirement that both parties exercise good faith during the interactive process. Additionally, the jury determined Bothwell did not act in good faith following extensive argument by defense counsel that Howard was the party acting in bad faith while Bothwell was innocent with respect to the breakdown of the interactive process. Howard denies that the Court erred in declining Bothwell's proposed instruction; but, even if there was error, it was not prejudicial to Bothwell and does not warrant remand for a new trial.

Nor did the Trial Court err when it refused to submit an instruction on constructive discharge based on the argument that proof of constructive discharge is required to recover lost wages. However, even if there was error, there was no prejudice to Bothwell because the instructions included the damages instruction

9

requiring proof of causation and because Bothwell argued in closing argument that Howard did not sustain lost wages because she resigned.

Appellate Case: 23-1068    Page: 17    Date Filed: 06/29/2023 Entry ID: 5291076

# ARGUMENT

## I. THE COURT LACKS JURISDICTION TO REVIEW THE TRIAL COURT'S DENIAL OF SUMMARY JUDGMENT; BUT IF THERE IS JURISDICTION, THERE WAS SUFFICIENT EVIDENCE TO SUPPORT THE JURY'S VERDICT THAT BOTHWELL WAS RESPONSIBLE FOR THE BREAKDOWN OF THE INTERACTIVE PROCESS AND DID NOT ACT IN GOOD FAITH.

Bothwell's first argument on appeal is that the Trial Court erred in denying Bothwell summary judgment because Howard terminated the interactive process. Bothwell's brief, however, ignores key facts that demonstrate Bothwell was not acting in good faith, denied the accommodation, and then stonewalled Howard for weeks rather than engaging in a good faith investigation and dialogue regarding her request. She only resigned after she found her job posted online. Those facts are detailed in subsection I.B., below. Initially, however, the Court should consider its jurisdiction. Here, Bothwell is asking this Court to review the Trial Court's decision to deny summary judgment on those grounds. Pursuant to the authority below, this Court does not have jurisdiction to review the decision on summary judgment.

### A. **This Court lacks jurisdiction to review the Trial Court's denial of summary judgment**.

The law on point is well developed in this Circuit and has been recently confirmed by the United States Supreme Court in *Dupree v. Younger*, 598 U.S. ___, 143 S. Ct. 1382 (2023). In 1997, this Court decided *Metropolitan Life Ins. Co. v. Golden Triangle*, 121 F.3d 351 (8th Cir. 1997), recognizing that "[a] ruling by a

11

district court denying summary judgment is interlocutory in nature and not appealable after a full trial on the merits." *Id*. at 354 (quoting *Johnson Int'l Co. v. Jackson Nat'l Life Ins. Co.*, 19 F.3d 431 (8th Cir. 1994)).

> The final judgment from which an appeal lies is the judgment on the verdict. The judgment on the verdict, in turn, is based not on pretrial filings [to support summary judgment] under Federal Rule of Civil Procedure 56(c), but on evidence adduced at trial.
>
> … The primary question on summary judgment is whether there exists a genuine issue of material fact as to the elements of the party's claim. Once the summary judgment motion is denied and the case proceeds to trial, however, the question of whether a party has met its burden must be answered with reference to the evidence and the record as a whole rather than by looking to the pretrial submissions alone. The district court's judgment on the verdict after a full trial on the merits thus supersedes the earlier summary judgment proceedings.

*Id*. (quoting *Johnson Int'l*, 19 F.3d at 434) (numerous additional citations omitted).

This Court affirmed this jurisdictional rule in 2014, noting that the "proper redress for an argument denied at summary judgment is not through appeal of that denial, 'but through subsequent motions for judgment as a matter of law and appellate review of those motions if they were denied.'" *New York Marine and General Ins. Co. v. Continental Cement Co., LLC*, 761 F.3d 830, 838 (8th Cir. 2014) (quoting *Johnson Int'l*, 19 F.3d at 434). The Supreme Court confirmed the rule this year, holding specifically that denial of summary judgment is not reviewable on appeal because "[f]actual challenges depend on, well, the facts, which the parties develop and clarify as the case progresses from summary judgment to a jury verdict."

12

*Dupree*, 143 S. Ct. at 1388. "Thus, '[o]nce a case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary judgment motion.'" *Id.* (quoting *Ortiz v. Jordan*, 562 US. 180, 184, 131 S. Ct. 884, 178 L.Ed.2d 703 (2011)). "So after trial, a district court's assessment of the facts based on the summary judgment record becomes 'ancient history and [is] not subject to appeal.'" *Id.* (citing *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc*., 831 F.3d 815, 823-824 (7th Cir. 2016)).

There are limited circumstances where the court's denial of summary judgment may be appealed following a trial on the merits, but those circumstances do not apply here. Appellate review of the district court's denial of summary judgment may be appropriate where the issue is a legal one, preliminary to the merits, such as a decision on choice of law, statutory time bars, collateral estoppel, and standing. *Id.* at 838-839.

In this case, the issue decided on summary judgment that Bothwell now seeks to appeal was not a preliminary legal issue. Rather, it related specifically to the evidence: whether there was a material issue of fact as to the party responsible for terminating the interactive process. (Appellant's Brief, pp. 13-14). Because this issue is not preliminary to the merits, but instead relates directly to the merits, this Court does not have jurisdiction to consider the propriety of the Trial Court's decision on

13

summary judgment. For that reason, Bothwell's first point on appeal should be denied.

### B. To the extent the Court considers the issue preserved and properly appealed, the Trial Court did not abuse its discretion when it denied Bothwell's Motion for New Trial based on the sufficiency of the evidence.

Bothwell argued in its Motion for New Trial that the verdict was against the weight of the evidence because the evidence showed Howard resigned, thereby establishing that Howard did not act in good faith and was responsible for termination of the interactive process. (App. 1015-1040, R. Doc. 149, at 6, 17-21). It ignored the fact that Howard attempted, for months, to work with Bothwell on the issue, only to find her job posted online. To the extent this Court deems this issue preserved in light of the Motion for New Trial arguing the same factual issue, Howard addresses the merits of the argument here.

The standard of review for a court's denial of a Motion for New Trial based on the sufficiency of the evidence is abuse of discretion. *PFS Distribution Co. v. Raduelchel*, 574 F.3d 580, 589 (8th Cir. 2009) (citing *Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997)). "When a motion for a new trial is founded on the assertion that the 'jury's verdict is against the weight of the evidence,' the district court's ruling is 'virtually unassailable on appeal.'" *Id*. The question for the appellate court is whether, "[v]iewing the evidence in the light most favorable to the verdict," there is an "absolute absence of evidence to support the jury's verdict." *Id*. (quoting

14

*Computrol, Inc. v. Newtrend, L.P.*, 203 F.3d 1064, 1068-69 (8th Cir. 2000); *Slidell, Inc. v. Millennium Inorganic Chems., Inc.*, 460 F.3d 1047, 1057 (8th Cir. 2006)).

Notably, during the instruction conference, after Bothwell argued that Howard "stopped the interactive process before we could fully determine whether or not there actually was a direct threat…", the Trial Court stated:

> I am far from persuaded that Dr. Nicholson was anything close to an objective evaluator here. It does seem to me that from the very first moment he tried everything he could to thwart the accommodation by misquoting people, misquoting sources, by not quoting the relevant portions of certain text, and frankly I think he tainted the opinions of other people on the committee. However – and I find his idea that this poses any significant risk to patients dubious. However, this was his testimony and the jury has the right to interpret the facts. I don't.

(Trial Tr. Vol. IV, pp. 596:1-596:24).

Consistently, when the Trial Court denied the Motion for New Trial, he held that there was "more than sufficient evidence to support the jury's verdict," noting that there was evidence at trial that Bothwell relied on unrelated legal guidelines when it evaluated Howard's request for accommodation; that Bothwell failed to cite to state or federal regulations applicable to Howard's request; that Bothwell failed to fully evaluate the health and safety implications of her request for accommodation; that Bothwell failed to advise all members of its evaluative committee that were tasked with reviewing the request that the request did not include a request to bring the service animal into the sterile compounding suite; that Bothwell failed to investigate the medical information Howard provided related to

15

her request, including failing to contact her doctor despite being granted specific permission to do; and that Bothwell made no effort to evaluate the nature and extent of the animal's training as a service animal. (App. 1406-1407, R. Doc. 164, at 2-3).

The trial court correctly summarized the evidence. While Bothwell was aware of the specific requested accommodation in June 2020, Bothwell did not take any steps to evaluate the feasibility of the proposed accommodation until after it had asked Howard to provide multiple sets of paperwork to substantiate her request. In spite of representing that this information was necessary to evaluate the request, none of the information contained in Bothwell's evaluations referenced the information Bothwell demanded in June and July 2020. (Trial Ex. J-50, J-59 App. 1677-78, 1750; Trial Ex. J-12, App. 1446-50).

Bothwell requested an authorization to discuss Howard's requested accommodation with her medical providers, but never used the authorization to inquire regarding the request for accommodation. (Trial Tr. Vol. I, pp. 39:14-23, 46:14-47:3). Similarly, while Howard provided information to allow Bothwell to contact CARES, the organization that trained her service animal, Bothwell never inquired of the organization. (Trial Tr. Vol. I, p. 47:4-10). It never asked about the service animal, its breed, grooming, medications, vaccinations, training, or other relevant information. (Trial Tr. Vol. I, p. 47:4-25). Other than repeatedly demanding Howard get more information from her physicians, there was no evidence that

16

Bothwell took any action to evaluate the feasibility of the request until the end of July 2021. Even at that time, there was no legitimate investigation; instead, Bothwell began gathering support for the decision it had already made, i.e., to deny the accommodation requested.

Lisa Irwin, Bothwell's HR employee that coordinated its response to the request for accommodation, testified she created a team to analyze the requested accommodation and denied that there was any decision made before the full team had an opportunity to evaluate the issue. The evidence, however, showed that, prior to obtaining the team's opinions, Irwin advised that team: "I am familiar with the ADA. Our goal will be to provide enough information to support our denial of this claim." (Trial Tr. Vol. I, pp. 50:25-51:4).

The team Irwin assembled to "evaluate" the request included Kathy Trogden, an infection control prevention specialist. Bothwell, however, handicapped her ability to assist from the start. For example, no one from Bothwell advised her as to the specifics of Howard's request, i.e., that the animal would be permitted into the pharmacy but not into the sterile compounding suite. (Trial Tr. Vol. II, pp. 265:25-266:13). For that reason, Trogden evaluated the service animal request in relation to the entire pharmacy, including the sterile compounding suite. *Id.* Additionally, Trodgen offered to perform a full risk assessment to completely evaluate the risk

17

associated with the proposed accommodation; Bothwell did accept that offer. (Trial Tr. Vol. II, pp. 258:5-25).

The evidence also demonstrated that Trogden's report was focused not on a complete analysis but on support for a denial, as requested by Irwin prior to her team drafting reports. For example, Trogden relied on CDC guidelines in her report, but ignored guidance from the same source of information that was specific to risks posed by service animals. (Trial Tr. Vol. II, pp. 269:2-275:8; Trial Ex. J-50, App. 1677-78).

The evaluation team also included risk manager, Jennifer Unkel. Unkel was still evaluating the issue when she received Irwin's email directing the team to provide enough documentation to support the denial of the claim. (Trial Tr. Vol. II, pp. 246:22-248:10). Unkel relied on CMS guidelines that incorporated state law and regulations as well as the US Pharmacopeia, standards applicable to pharmacies in Missouri. (Trial Tr. Vol. II, pp. 203:18-209:22). While she relied on it, she failed to review the USP or the state regulations applicable to service animals in the pharmacy. *Id*. Additionally, no one asked Unkel to evaluate the mitigation measures posed by Howard during the accommodation process in spite of making representations that the team had engaged in that analysis. (Trial Tr. Vol. II, pp. 209:23-210:22).

18

Dr. Brad Nicholson, the pharmacy director, was the most obstructive member of the evaluation team. He looked for support to deny the requested accommodation, completely ignoring everything else. For example, he included certain guidance from the CDC that supported Bothwell's denial of the accommodation, but blatantly ignored other provisions of the same publication that would have supported the accommodation. (Trial Tr. Vol. I, pp. 87:22-93:19; Trial Exs. J12, J-28, App. 1446-1507). He relied on sections of the Missouri State Regulations but ignored a provision within that same regulation that specifically excluded service animals from the general rule that animals are not permitted in pharmacies. (Trial Tr. Vol II, pp. 301:13-302:17; Trial Ex. J-12, App. 1466-50). Nicholson also relied on draft guidance from the FDA to support his position that the accommodation should be denied, even though that guidance did not apply to Bothwell's pharmacy area outside the sterile compounding suite. (Trial Tr. Vol. I, pp. 124:1-126:13; Trial Tr. Vol. III, pp. 489:21-490:20).

On August 6, 2020, Bothwell denied Howard's requested accommodation. (Trial Tr. Vol. I p. 53:1-17; Trial Ex. J14, App. 1456-1457). After issuing the initial denial, Nicholson made inquiries with the Department of Health and Senior Services and the Board of Pharmacy about the requested accommodation, failing to clarify that Howard was *not* asking to take the service animal into the sterile compounding suite. (Trial Tr. Vol. I, pp. 70:23-78:6; 81:1-82:18; Trial Tr. Vol. III, pp. 298:8-

19

308:13; Trial Ex. J-20, J-21, J-25, App. 1460-65, 1477). After receiving their responses, both of which indicated that the issue would be analyzed on a case-by-case basis, Nicholson misrepresented to his team and others that the Board of Pharmacy and DHSS would not permit a service animal in the pharmacy. *Id*.

When Howard asked about a potential transfer to the employee pharmacy as an alternative accommodation, Bothwell denied that request and gave Howard false information to support that denial. Specifically, Bothwell asserted it had already hired someone for the position, when it had not, and relied on a job description created during the "interactive process" to support their position that Howard was not qualified for that role, but then never adopted that job description. (Trial Tr. Vol. I, pp. 62:6-64:9).

Additionally, despite representing it was engaged in the interactive process to analyze Howard's requested accommodation, Bothwell began recruiting Howard's replacement in mid-to-late August 2020. (Trial Tr. Vol. I, pp. 65:10-70:14; Trial Tr. Vol. III, pp. 286:17-298:5; Trial Ex. P-50, P-52, P-55, App. 2660-2690). When Howard, through counsel, inquired about the job posting, Bothwell told Howard unequivocally that it was not recruiting for her position. *Id*. This was a lie, proven by the form Nicholson filled out that specifically indicated he was recruiting to replace Howard at that time. *Id*.

Appellate Case: 23-1068     Page: 27     Date Filed: 06/29/2023 Entry ID: 5291076

After being stonewalled with respect to her accommodation from early June to late September, Howard saw her job posted. This was the proverbial straw that broke the camel's back, and Ms. Howard decided to resign. (Trial Tr. Vol. III, pp. 395:6-396:12). It was only after Howard submitted her resignation on September 23, 2020, that Bothwell proposed a binding, neutral evaluation of the issue, even though it had been in contact with the proposed neutral consultant since August 21, 2020. (Trial Tr. Vol. I, pp. 81:8-85:19; Trial Ex. J-25, J-27, App. 1477, 1489-98; Trial Ex. J-44, App. 1644-48). Notably, at the time Bothwell proposed hiring the "neutral," Nicholson had already provided false information to that "neutral" regarding the position of the Board of Pharmacy and DHSS with respect to the service animal request. (Trial Tr. Vol. I, pp. 81:1-82:18, Trial Ex. J-25, App. 1477).

Viewing the entire record in light most favorable to the jury verdict – giving Howard the benefit of all legitimate inferences, and assuming to be true all facts and inferences reasonably supported by testimonial and documentary evidence – the jury could have clearly concluded that the delay throughout the interactive process was unreasonable and intended to cause Howard to resign, and that Bothwell was not acting in good faith even though it had placed her on paid leave extending through the date of her resignation. In other words, the breakdown of the interactive process was Bothwell's doing, not Howard's.

Appellate Case: 23-1068     Page: 28     Date Filed: 06/29/2023 Entry ID: 5291076

## II. HOWARD PRESENTED EVIDENCE THAT DEMONSTRATED HER SERVICE ANIMAL WAS EFFECTIVE IN ALERTING HER TO HIGH AND LOW BLOOD SUGARS.

In its second point on appeal, Bothwell argues that the efficacy of the proposed accommodation is an element of Howard's claim, and that Howard failed to present evidence that her service animal effectively alerted her to high and low blood sugars. That is incorrect.

Howard agrees that this Court's standard of review on this issue is de novo. When evaluating a motion for judgment as a matter of law in this context, both the Trial Court and this Court must: (1) consider the evidence in the light most favorable to plaintiff; (2) assume all evidentiary conflicts are resolved in favor of plaintiff; (3) assume as proved all facts which the plaintiff's evidence tends to prove; (4) give the plaintiff the benefit of all favorable inferences which may reasonably be drawn from the facts proved; and (5) deny the motion if reasonable minds could differ as to the conclusion to be drawn from the evidence. *Wilson v. City of Hazelwood, Mo.*, 628 F.Supp.2d 1063, 1067 (E.D. Mo. 2008) (citing *Coleman v. Burlington N., Inc.*, 681 F.2d 542, 545 (8th Cir. 1982) (additional citations omitted)). The Court should consider both circumstantial and direct evidence, and the verdict overturned "only where the evidence points all one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." *Id*.

22

Initially, Howard challenges the extent to which "efficacy" is an element of her claim. The Eighth Circuit requires the requested accommodation "relate to the individual's disability," or – phrased differently – that there be "a causal connection between the major life activity that is limited, and the accommodation sought." *Hustvet v. Allina Health Systems*, 910 F.3d 399, 410-411 (8th Cir. 2018) (numerous citations omitted). However, even assuming proof of efficacy was required, there was ample evidence of the service animal's efficacy at trial.

There was circumstantial and direct evidence to establish that Howard's service animal, Corry, was specifically trained to alert her to high and low blood sugars and that Corry was effective in doing so. Dr. Adrian Delaney testified at trial by video deposition. Dr. Delaney is Howard's treating physician at Clay Platte Family Medicine and was designated with other treaters as a non-retained expert to testify related to his treatment and the accommodation requested. (App. 21). Dr. Delaney is a Medical Doctor, has been in practice for 15 years, and is Howard's primary care physician. (App. 1775 at 9:2-19). Dr. Delaney has knowledge of Ms. Howard and diabetic service animals, including knowledge about how diabetic service dogs are trained. (App. 1785 at 51:18-21). In the context of his practice, Dr. Delaney is familiar with service animals for diabetic patients, having researched diabetic service animals for years. (App. 1777 at 17:14-18:13).

23

Dr. Delaney testified that diabetic alert dogs are highly trained and can alert patients ahead of time of a blood sugar drop that is impending so that the patient can take steps to correct the problem or mitigate its effects, as well as reduce injuries from falls and other related complications. (App. 1783 at 43:4 -14). In his opinion, diabetic service animals provide a secondary barrier to complications because technologies sometimes fail. (App. 1777 at 17:14-18:13). He also testified that diabetic service animals can retrieve testing supplies and medications if the patient is unable to do so, carry objects, open doors and drawers, and support the patient with walking and recovery after an episode of hypoglycemia. (App. 1783 at 43:15-21).

Dr. Delaney testified that, since she obtained her service animal in 2020, Howard has utilized that animal to help her control her diabetes. (App. 1778 at 21:7-22:5). In his opinion, Howard benefits from her specially trained service animal, in that it helps her mitigate her disability and improves independence and quality of life by assisting in hypoglycemic emergencies. (App. 1781 at 35:9-36:15; App. 1783 at 42:8-44:1). Finally, in his opinion, a diabetic service animal would greatly benefit Howard's daily life and is a medical necessity. (App. 1783 at 43:22-44:1). Bothwell did not challenge Dr. Delaney's qualifications, and did not object to the scope of his testimony based on the scope of the disclosure. Bothwell never objected to Dr. Delaney testifying on these issues.

24

Further, Howard testified about what Corry is trained to do, and how Corry alerts her pursuant to that training. (Trial Tr. Vol. III, pp. 400:22-402:20). Howard also confirmed that, to obtain the service animal, she went through an application process to obtain a diabetic service animal from an organization referred to as CARES. (Trial Tr. Vol. III, pp. 341:23-342:16). Howard testified that she identified CARES as an appropriate organization from which to obtain a diabetic service dog after confirming it was accredited to provide service animals. *Id*. She applied for a diabetic service animal and was then paired with a diabetic service animal from the accredited organization. *Id*. Correspondence from CARES also confirmed that "each dog is individually selected for a person to receive, many hours of specific training has gone into the preparation of your new canine assistant." (Trial Ex. J-34, App. 1524). Again, Bothwell did not challenge the admissibility of this correspondence from CARES at trial, nor did it seek to limit the purpose for which it was offered. As such, it cannot now complain as to its admission for any purpose.

Notably, Bothwell's own diabetes expert, Dr. Bernstein, testified that, while continuous glucose monitors are more reliable than service animals in detecting low blood sugars, *service animals are also able to detect blood sugar changes*. (Trial Tr. Vol. III, pp. 513:21-514:3, 522:70-523:9). In fact, the very study he relied on in providing those opinions proved that diabetic alert dogs were able to detect high and low blood sugars, in that the alerts from those service animals coincided with blood

25

sugar lows more often than they would if the dogs were alerting at random. *Id*. Dr. Bernstein also agreed that the performance of service animals is highly variable, demonstrating Howard's own testimony regarding the performance of her service animal (Corry) extremely relevant to the analysis. *Id*.

Howard testified that Corry is trained to alert her to highs and lows in her blood glucose by giving her a concentrated stare that Corry cannot be distracted from for any reason. (Trial Tr. Vol. III, pp. 401:6-402:20). When Corry alerts in that manner, Howard checks her blood sugar. *Id*. At first, Corry was right only about fifty percent of the time. *Id*. As the pair worked together and continued their training, Corry became substantially more accurate. *Id*. In fact, after having been paired for over two years, Corry alerts correctly ninety-five percent of the time. *Id*. In other words, 95 out of 100 times that Corry alerts, Howard checks her blood sugar, and it is either out of range or is trending quickly in that direction. *Id*. Howard testified that there have been occasions when Corry has alerted and her blood sugar was within normal range but that, after testing, Corry continued to alert. *Id*. When she checked her sugars 15 to 20 minutes later, given Corry's continued alert, her blood sugars had fallen out of range. *Id*.

Bothwell's appeal on this point should be denied. Howard offered both circumstantial and direct evidence that her requested accommodation related to her

Appellate Case: 23-1068    Page: 33    Date Filed: 06/29/2023 Entry ID: 5291076

disability was effective in alerting her to high and low blood sugars, and that the animal assists Howard in avoiding long term complications of her disease.

### III. HOWARD ESTABLISHED THAT SHE REQUIRED ACCOMMODATION TO ENJOY EQUAL BENEFITS AND PRIVILEGES OF EMPLOYMENT.

Bothwell argues that Plaintiff did not present evidence that her accommodation provided her equal access to a benefit of privilege of employment, relying primarily on the case of *Hopman v. Union Pacific Railroad*, 2022 WL 963662 (E.D. Ark. March 30, 2022). That case has since been affirmed on appeal by this Circuit, see *Hopman v. Union Pacific Railroad*, 68 F.4th 394 (8th Cir. 2023). *Hopman*, however, is distinguishable. There, this Court considered a service animal that the employee utilized to avoid "mental and psychological pain," and whether his employer's denial of that accommodation prevented the employee from enjoying equal privileges and benefits of his employment.

In reaching its decision in *Hopman*, this Court relied substantially on the EEOC's regulations and guidance of the statute, and ultimately rendered its decision based on that guidance. However, this Court also noted that "ADA failure to accommodate cases are fact- and content-specific, and this opinion should be applied accordingly." *Hopman*, 68 F.4th at 402. This Court declined to hold – as urged by the employer and its supporting amici – that the ADA "requires employers to provide

27

reasonable accommodations only when necessary to enable employees to perform the essential functions of their jobs." *Id*.

Remedial anti-discrimination statutes like the ADA must be given a liberal construction. *Schallehn v. Cent. Tr. & Sav. Bank*, 877 F.Supp. 1315, 1332 (N.D. Iowa 1995) (citing extensive authority on point). For the reasons discussed below, and in light of the rule that the ADA should be interpreted liberally to accomplish its purpose, the Court should limit the holding in *Hopman* to the facts at issue in that case, i.e., a request for a service animal that is utilized only for the purpose of providing comfort and support, alleviating only mental and psychological pain. In other words, to circumstances where the service animal's function is limited to that of an emotional support animal.

In this case, the evidence presented by Howard established that she obtained a service animal to assist her in the management of her chronic disease, Type 1 diabetes. (Trial Tr. Vol. III, p. 342:11-16). The evidence established that diabetic service animals, including Howard's diabetic service animal, are trained to detect high and low blood sugar levels, inclusive of instances where Howard's blood sugar was trending toward a high or low but was at the time in normal range. (Trial Tr. Vol. III, pp. 341:23-342:16, 400:22-402:20; Trial Ex. J-74, Delaney Dep. pp. 43:4 - 14, App. 1783; Trial Ex. J-34, App. 1524). Her physician confirmed its medical necessity and testified that it was an important tool in Howard's management of her

28

chronic disease. (App. 1778 at 21:7-22:5; App. 1781 at 35:9-36:15; App. 1783 at 42:8-44:1) The evidence also established that – if not effectively managed – Howard's Type I diabetes would cause her severe health complications over time, and that the service animal would assist Howard to manage her diabetes to avoid long term complications and avoid serious acute hypoglycemic episodes that could cause death. (App. 1776 at 13:16-16:20; App. 1778 at 20:20-22:5). She did not need the service animal to perform the essential functions of her job, but she did require it to be with her to provide alerts for high and low blood sugar instances.

The EEOC's interpretive guidance recognizes that equal employment opportunity includes the opportunity for an employee to attain the same level of performance. 29 C.F.R. § Pt. 1630 App.  It also acknowledges there are situations where an employer may be required, as a reasonable accommodation, to permit a disabled individual the opportunity to use equipment, aids, and services, even where the employer is not required to provide them. 29 C.F.R. § Pt. 1630 App.  "For example, it would be a reasonable accommodation for an employer to permit an individual who is blind to use a guide dog at work, even though the employer would not be required to provide a guide dog for the employee." *Id*. The use of a guide dog to assist a blind person in navigating the employer's premises is far more parallel to the circumstances of this case than the facts in *Hopman*. The dog is not necessary for the blind employee to perform his work or access an employee cafeteria or attend

a company picknick; but it is a tool, an aide, that the employer may nonetheless be required to accommodate.

Given the facts at issue here, the better parallel is the extent to which the employers have been required, under the Act, to accommodate an employee's use of other tools to monitor and manage fluctuations in blood sugar due to diabetes. In *Nawrot v. CPC Int'l*, 259 F.Supp.2d 716, 726 (N.D. Ill. 2003), the Northern District of Illinois considered an employee's request for accommodation to allow him to check his blood sugars. It reviewed the three categories of accommodations and whether the employee in that case could state an ADA claim where he did not require his requested accommodation to perform essential functions of his job. *Nawrot*, 259 F.Supp.2d at 724-25. Initially, the court noted the ADA's purpose: "to remove barriers preventing disabled employees from enjoying the same employment opportunities available to non-disabled employees." *Id*. (citing 29 CFR § 1630). It went on to analyze the third prong of accommodations (accommodations that permit the disabled employee to enjoy equal benefits and privileges of employment) with that purpose in mind, holding that "[a]ccommodatinons for the treatment of a disability are of the type which may not specifically help someone perform the essential functions of his job, but which are required by the ADA." *Id*. at 726.

30

With the purpose of the ADA as a starting point, the *Nawrot* Court held that the ADA may require accommodations regardless of essential job functions where the employee needs the accommodation to live, based on the following analysis:

> The analogous Rehabilitation Act cases demonstrate that the ADA requires accommodations for employees like Nawrot whether or not he needs the accommodation for his essential job functions. Whether Nawrot is employed as a warehouse supervisor, an airline pilot, or an accountant, he will need to check his blood sugar levels and administer insulin several times a day. No matter what his job duties, he will always need this accommodation. **To hold that a person with potentially life-threatening diabetes is not entitled to accommodations so that he may monitor his blood sugar levels would force diabetics like Nawrot to choose between working while risking physical harm and death, or unemployment. The ADA was created to prohibit placing disabled persons in this position.**

*Id*. (emphasis added). The same standards should apply in this case, subject to the jury's determination of reasonableness in light of the availability of other tools.

Bothwell's argument is premised on the idea that if non-disabled employees are not allowed to bring service animals to work, then allowing a disabled employee to do so is not a privilege or benefit of employment enjoyed by other employees. The idea, however, that no person with a disability may use a service dog unless a person without disabilities had been allowed to use a service dog first is fundamentally flawed and contrary to the purpose and intent of the ADA. Non-disabled employees have no need for a service animal and, therefore, would have no reason to bring a service animal to work. Similarly, non-disabled employees do not

31

need an accommodation to allow them to use equipment or aids manage their health and avoid both acute and long term complications of the disability.

Defendant would have this Court analyze the equal benefits and privileges of employment element as if the case were one alleging disparate treatment, i.e., that unless the employee can show the employer offers the same accommodation to nondisabled employees, the employee cannot prove its claim. That interpretation is wholly inconsistent with the intent of the ADA. As noted by United States Supreme Court twenty years ago:

> [P]references will sometimes prove necessary to achieve the Act's basic equal opportunity goal. The Act requires preferences in the form of "reasonable accommodations" that are needed for those with disabilities to obtain the same workplace opportunities that those without disabilities automatically enjoy. By definition any special "accommodation" requires the employer to treat an employee with a disability differently, i.e., preferentially. And the fact that the difference in treatment violates an employer's disability-neutral rule cannot by itself place the accommodation beyond the Act's potential reach.

> Were that not so, the "reasonable accommodation" provision could not accomplish its intended objective .... Neutral "break-from-work" rules[, for instance,] would automatically prevent the accommodation of an individual who needs additional breaks from work, perhaps to permit medical visits.

*US Airways, Inc. v. Barnett*, 535 U.S. 391, 397–98, 122 S. Ct. 1516, 152 L.Ed.2d 589 (2002). A request for ADA accommodation is, by its very nature, a request to be treated differently. The fact that an ADA plaintiff has not established a non-

32

disabled employee has been granted the same accommodation cannot be the applicable standard.

The ADA "compels employers to modify their work requirements to enable disabled individuals to have the same opportunities as their non-disabled counterparts." *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004). As explained by the *Peebles* Court, "[t]he reasonable accommodation requirement is best understood as a means by which barriers to equal employment opportunity of an individual with a disability are removed or alleviated." *Id*. Peebles remains good law in this Circuit, and was not overruled by *Hopman*.

Numerous circuits considering the issue have held that the duty to accommodate extends to those accommodations which allow the disabled employee to work at full capacity, in reasonable comfort, without pain or risk to their health. In *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1176 (7th Cir. 2013) (reversed on other grounds, *Ortiz v. Werener Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016)), the Seventh Circuit held that "[t]he duty of reasonable accommodation is satisfied when the employer does what is necessary to enable the disabled worker to work in 'reasonable comfort'."

In *Exby-Stolley v. Board of County Commissioners*, 979 F.3d 784 (10th Cir. 2020), the Tenth Circuit held that the ADA's reasonable accommodation requirement contemplates accommodations that will permit an employee to operate

33

at full capacity and attain the same level of performance as her peers who are not disabled. In *Hill v. Associates for Renewal in Education, Inc*., 897 F.3d 232, 239 (D.C. Cir. 2018), the DC Circuit held that a "reasonable jury could conclude that forcing [the plaintiff] to work with pain when that pain could be alleviated by his requested accommodation violates the ADA."

In G*leed v. AT&T Mobility Services*, 613 Fed. Appx. 535, 538-39 (6th Cir. 2015), the Sixth Circuit held that accommodation – to provide a chair to use while working – that permitted the plaintiff to work without great pain and a heightened risk of infection qualified as reasonable accommodation. The Sixth Circuit relied on the ADA's requirement to provide accommodations that permit the employee to enjoy equal benefits and privileges of employment when it rejected the defendant's argument that if the plaintiff is "physically capable of performing his job – no matter the pain or risk to his health – then it had no obligation to provide any accommodation, reasonable or not." *Id*. Whether non-disabled employees were permitted to work while seated is not cited as a basis for any of the court's analysis. Rather, the *Gleed* Court concluded that the "requested accommodation does seem reasonable, given that (taking the facts in the light most favorable to Gleed) standing causes him great pain and increases his risk of skin infections." *Id*. at 538. The Sixth Circuit held that, because the ADA requires accommodations that allow the employee to enjoy equal benefits and privileges of employment, the request for an

34

accommodation that allowed the plaintiff to work without great pain and a heightened risk of infection was a reasonable one covered by the ADA. *Id*. The *Gleed* case supports Howard's position herein.

The First Circuit and the Ninth Circuit also agree, recognizing employers may be required to accommodate an employee who is able to perform a job's essential functions, where the accommodation is required to allow equal enjoyment of employment privileges and benefits *or to pursue therapy or treatment*. *Jaques v. Clean-Up Group, Inc*., 96 F.3d 506, n. 9 (1st Cir. 1996); *Buckingham v. United States*, 998 F.2d 735, 740-41 (9th Cir. 1993). As the Ninth Circuit aptly stated, "an employer is obligated not to interfere, either through action or inaction, with a handicapped employee's efforts to pursue a normal life." *Buckingham*, 998 F.2d at 740.

The *Hopman* decision is premised on its holding that Hopman's request for a service animal had the limited purpose of allowing him to work without mental or psychological pain: in other words, that the service animal was acting as an emotional support animal. It is true that Howard testified having her service animal at work allowed her to work without the high stress levels that accompany concerns regarding her blood sugar levels. That, however, is an incomplete summary of the testimony in this case. In fact, Howard and her physician testified that her service

35

animal assists her in mitigating the short- and long-term complications of her chronic disease.

Dr. Delaney testified that a Type 1 diabetic has significant risk of long-term complications associated with the disease over a lifetime, including but not limited to cardiovascular disease, retinopathy of the eyes, kidney failure, and neuropathy. (App. 1776 at 13:16-14:7). To manage those risks, it is important for a Type 1 diabetic to manage their blood sugars. *Id*. Additionally, episodes of low blood sugar that are not promptly remedied can lead to symptoms ranging from fatigue, headaches, and extreme hunger to loss of vision, muscle weakness, inability to walk, seizures, and even death. (Trial Tr. Vol. III, p. 334:6-16). Dr. Delaney testified that diabetic service animals provide a secondary barrier to complications arising from diabetes and that Ms. Howard utilizes her service animal to help manage and control her diabetes. (App. 1777-78 at 17:14-18:13; 21:7-22:5). In his opinion, Ms. Howard benefits from her diabetic service animal, in that it helps her mitigate her disability and improves independence and quality of life by assisting in hypoglycemic emergencies. (App. 1781 at 35:9-36:15; App. 1783 at 42:8-44:1). Dr. Delaney opined that a diabetic service animal would greatly benefit Ms. Howard's daily life and is a medical necessity. (App. 1783 at 43:22-44:1app.).

The denial of Ms. Howard's accommodation would have required her to work without the tool she selected, with the assistance and support of her physician, to

36

manage and control her chronic disease state. Failure to manage her disease puts Ms. Howard at risk for severe, life-threatening complications. Forcing an employee to risk serious harm from the symptoms of her disability when a reasonable accommodation is available to address those symptoms is contrary to the purpose and text of the ADA. This is why accommodations of this type have been routinely approved by multiple courts, including *Nawrot*, 259 F.Supp.2d at 726. If one follows Bothwell's argument to its logical conclusion in the case of diabetics, no diabetic would be entitled to an accommodation to check her blood sugars because that is not required to allow her to perform her work, and because the employer does not provide employer sponsored blood glucose management to non-disabled employees. That result is illogical.

In summary, the great weight of authority provides that an accommodation which assists a party in addressing physical pain and/or disease complication or aggravation arising from a disability while working, as well as an accommodation that assists with the management or treatment of an employee's disability, are accommodations covered by the prong of the ADA requiring accommodations that permit the disabled employee to enjoy equal benefits and privileges of employment. *Hopman*, which involves a service animal serving as an emotional support animal, is distinguishable and should not be applied to the facts of this case.

37

Notably, this point on appeal is separate from any argument as to the *reasonableness* of the proposed accommodation itself, which Bothwell does not challenge on appeal. As noted by the Trial Court: "While Defendant presented evidence of alternative methods of monitoring Plaintiff's blood sugar levels, Defendant provided no evidence that the use of the service animal was ineffective or unsupported by medical research." (App. 1407, R. Doc. 164, at 3). The jury's verdict included a determination that the accommodation Ms. Howard requested was reasonable, and that determination has not been challenged in post-trial motions or in this appeal.

## IV. THE TRIAL COURT'S DECISION NOT TO INSTRUCTION THE JURY THAT GOOD FAITH IS AN ELEMENT OF HOWARD'S CLAIM WAS NOT AN ABUSE OF DISCRETION.

### A. The jury was instructed on both parties' duty to act in good faith and found Bothwell did not act in good faith; therefore, any instructional error was not an abuse of discretion because it was not prejudicial and would not have affected the verdict.

Howard agrees that the standard of review for instructional error is abuse of discretion. *Am. Family Mut. Ins. Co. v. Graham*, 792 F.3d 951, 958 (8th Cir. 2015). "The standard for reviewing alleged errors in jury instructions is whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 867 (8th Cir. 2004) (citing *Jones v.*

*Swanson,* 341 F.3d 723, 734 (8th Cir. 2003)). "The form and language of jury instructions are committed to the sound discretion of the district court so long as the jury is correctly instructed on the substantive issues in the case." *Id.* "This court will reverse on the basis of instructional error only if it finds the error affected the substantial rights of the parties." *Id.* Stated differently, a new trial can be granted if there is instructional error and the objecting party can "demonstrate that it was prejudiced." *See McKay v. WilTel Commc'n Sys., Inc.,* 87 F.3d 970, 976 (8th Cir. 1996). This Circuit has held that "[a] district court should not order a new trial unless the objecting party can show that the error had "a probable effect on [the] verdict." *Burry v. Eustis Plumbing & Heating, Inc.,* 243 F.3d 432, 434 (8th Cir. 2001). Here, Bothwell has not shown (nor has it endeavored to show) that giving an instruction regarding Howard's good faith would have caused the jury to find in Bothwell's favor.

Bothwell argues that it was error not to submit an instruction characterizing Howard's responsibility to act in good faith as an additional element of her claim. According to Bothwell, the jury was "ignorant" as to the issue. (Appellant's Brief, p. 52). That is a mischaracterization of the jury instructions as a whole because the trial court *did* instruct the jury on the requirement that both parties participate in good faith. The Trial Court advised the jury that the responsibility to act in good

39

faith extends to Howard and that this can be considered in reaching its verdict. (App. 984, R. Doc 131, at 28).

Instruction No. 22 read as follows:

When a duty to provide reasonable accommodation arises, both the employer and the employee are required to engage in an interactive process in good faith. This interactive process requires communication between the employer and employee, in good faith, to explore possible accommodations; consideration of the employee's request; and offering an accommodation that is reasonable and effective. You may consider whether each party engaged in the interactive process in good faith in reaching your verdict.

*Id*. Further, during closing argument Bothwell argued that it acted in good faith, and that Howard did not act in good faith. (Trial Tr. Vol. IV pp. 623:23-633:2). In fact, this was the primary focus of Bothwell's closing argument. *Id*. The jury disagreed, finding specifically that Bothwell did not make a good faith effort during the interactive process. (App. 1012, R. Doc. 134).

Clearly, given the jury instruction on good faith and Bothwell's argument in closing, the jury sided with Howard. Yet, Bothwell continues to argue that it is "not reasonably disputable" that Howard, rather than Bothwell, was responsible for the breakdown of the interactive process. This argument is disingenuous, ignores the evidence, ignores the Trial Court's impression thereof, and ignores the jury's finding that Bothwell did not act in good faith. *See* evidence cited in section I.B., *infra*. Given the evidence, the instruction to the jury regarding both parties' duties to act in good faith, and the jury's finding that Bothwell did not act in good faith, it is clear

40

that any instructional error was not prejudicial and did not have an effect on the jury's verdict.

**B. There was no instructional error**.

There is nothing in the applicable statute or regulations that identifies Howard's good faith as an element of her claim. The only reference to good faith as an element of a claim or defense comes with respect to the applicable damages statute, which states that if the defendant establishes it acted in good faith, the damages recoverable by the plaintiff are limited. 42 U.S.C. § 1981a(a)(3). Because it is not an element of Howard's claim, and because the jury was instructed as to the law regarding both parties' duty to act in good faith, it was not error to refuse to include proof of Howard's good faith as an element of her claim.

**V.    THE TRIAL COURT'S DECISION NOT TO SUBMIT A JURY INSTRUCTION ON CONSTRUCTIVE DISCHARGE WAS NOT AN ABUSE OF DISCRETION.**

The standard of review for Issue V on appeal is the same standard for Issue IV, abuse of discretion. *Am. Family Mut. Ins. Co.,* 792 F.3d at 958. "The standard for reviewing alleged errors in jury instructions is whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." *Children's*, 357 F.3d at 867 (citing *Jones,* 341 F.3d at 734). "This court will reverse on the basis of instructional error only if it finds the error affected the substantial rights of the parties." *Id.* Stated

Appellate Case: 23-1068    Page: 48    Date Filed: 06/29/2023 Entry ID: 5291076

differently, a new trial can be granted if there is instructional error and the objecting party can "demonstrate that it was prejudiced." *See McKay,* 87 F.3d at 976. This Circuit has held that "[a] district court should not order a new trial unless the objecting party can show that the error had "a probable effect on [the] verdict." *Burry,* 243 F.3d at 434.

### A. The Trial Court did not abuse its discretion in refusing to submit Bothwell's instruction on constructive discharge.

Bothwell complains that an instruction should have been provided to the jury that Howard could not recover damages for wages and benefits unless she proves constructive discharge, citing various cases articulating that, without proof of constructive discharge, there is no causation. Bothwell then summarily concludes "the failure to give the jury instruction substantially prejudiced Bothwell." (Appellant's Brief, p. 55). Bothwell does not provide any argument on this point, and, as such, has not established prejudice or that the failure to give the instruction had a probable effect on the jury's verdict. Because this is required to establish the Trial Court abused its discretion when instructing the jury, this point on appeal must fail.

Additionally, the record establishes that there was no prejudice. As acknowledged by Bothwell, proof of constructive discharge relates to causation and whether Bothwell's misconduct caused Howard's lost wages, or, alternatively, whether it was Howard's own decision to resign that caused those losses. There was

no prejudice here because the jury was properly instructed on causation. Instruction No. 25 instructed the jury to assess damages it finds that Howard sustained "as a direct result of defendant's failure to accommodate the plaintiff." (App. 987, R. Doc. 131, at 31). In closing, Bothwell argued that Howard was not damaged by Bothwell, and that, instead, her damages were caused because Howard "gave up" during the interactive process and quit. (Trial Tr. Vol. IV, p. 633:7-13).

The jury disagreed and awarded lost wages damages to Howard. This clearly demonstrates that the jury's verdict would have been no different even if the proposed constructive discharge instruction had been given. As such, there was no prejudice to Bothwell with respect to the Trial Court's decision not to give that instruction. Without proof of prejudice, there is no instructional error and this point on appeal fails.

### B. Bothwell does not argue that an adverse employment action is an element of Howard's claim and, as such, that issue is not presently before the Court.

Undersigned counsel is aware of the admonitions of a panel of this Circuit contained in the *Hopman* decision related to proof of adverse employment action in failure to accommodate cases. Bothwell did not include this issue in its post-trial Motion Practice, did not identify it in its Notice of Appeal, and has not argued it on appeal. As such, that issue is not properly before this Court, and the Court lacks jurisdiction to determine the issue in this case. See *Parkhill v. Minn. Mut. Life Ins.*

43

*Co.*, 286 F.3d 1051, 1058-1059 (8th Cir. 2002) (reviewing cases where issues not properly raised in Notice of Appeal, and acknowledging that the failure to do so deprives the appellate court of jurisdiction to determine the issue.)

### C. An adverse employment action is not an element of Howard's claim.

To the extent the Court finds it appropriate to consider whether an adverse employment action is an element of her claim, Howard disagrees with the *Hopman* Court's interpretation of Eighth Circuit precedent. First, the note in *Hopman* is dicta, and not a basis for the panel's decision in that case. Second, the *Hopman* Court refers back to this Circuit's en banc decision in *Faidley v. United Parcel Service, Inc.*, 889 F.3d 933, 940 (8th Cir. en banc 2018) as support for the assertion that an adverse employment action is an element of a failure to accommodate claim. That case, however, did no more than state the general rule that, to establish a prima facie case of discrimination under the ADA, the plaintiff must establish his disability, qualification, and an adverse employment action. *Id.* at 940. It did not analyze the nature of the required adverse employment action in a failure to accommodate case. In fact, its decision does not analyze that element of the claim at all.

If it finds it may reach this issue, Howard encourages the Court to reconsider its position and align itself with other Circuits that recognize that there is an affirmative duty to accommodate, and, as such, the failure to accommodate is itself

44

the adverse employment action required to make a prima facie case. See *Exby-Stolley v. Board of County Commissioners*, 979 F.3d 784 (10th Cir. 2020).

The ADA's plain text related to accommodation does not make any reference to an adverse employment action.

> "(5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."

42 U.S.C.A. § 12112 (West). As noted by this Court in *Peebles*, 354 F.3d at 767 (8th Cir. 2004), this rule imposes an affirmative duty, and a violation of this rule arises out of an omission, not an action. "In a reasonable accommodation case, the 'discrimination' is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations." Stated differently, "[t]he concern is compelling behavior, not policing an employer's actions." *Id. Peebles* remains good law in this Circuit.

The fact that failure to accommodate involves compelling behavior, rather than punishing an adverse employment decision, is also consistent with common sense. For example, consider an employee working at a register. The employee has a disability that makes standing painful, but not impossible. The employee requests an accommodation to use a stool while working. If an adverse action *other* than failure to accommodate is required to prove the failure to accommodate claim, that

45

employer would never be obligated to provide a stool as long as the employer did not take an additional adverse action. That result is inconsistent with the purpose of the ADA and the law of this Circuit as articulated in *Peebles*. The EEOC's regulations and interpretive guidance do not reference a requirement to prove an adverse employment action in addition to the failure to accommodate. *See* 42 U.S.C.A. § 12112 (West); 29 CFR § 1630.9; 29 CFR § Pt. 1630 App. In fact, the EEOC's interpretive guidance refers to adverse actions and failure to accommodate in the alternative, not cumulatively. *Id.* (discussing the merits of a discrimination claim, referring to adverse decisions that are impermissibly made by the employer on the basis of disability, reasonable accommodations were denied, *or* qualification standards were unlawfully discriminatory.) 29 CFR § Pt. 1630 App. (citing the 2008 Senate Statement of Managers at 4).

Because the duty to accommodate involves an affirmative duty to act, it is the failure to act that gives rise to liability. An adverse employment action may be necessary to prove damages in certain cases, but it is not an element of the claim.

## **CONCLUSION**

For the reasons stated herein, this Court should affirm the decisions of the Trial Court, and deny the relief requested by Appellant.

46

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the limitations in Rule32(a)(5), 32(a)(6), and 32(a)(7)(B), and the brief contains 12,046 words. This brief complies with the typeface requirements of Rule 32(a)(5) and type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in size 14, Times New Roman font. The undersigned certifies that the electronically filed brief and addendum have been scanned for viruses and are virus free.

/s/Jennifer R. Johnson
Jennifer R. Johnson          MO#59197


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on the 28th day of June 2023, a true and correct copy of the above and foregoing was filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system, which will send an electronic notice of such filing to all counsel of record.

/s/Jennifer R. Johnson
Jennifer R. Johnson          MO#59197

47